Colleen COHEN, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. CIV 78–580 PHX WEC.

United States District Court, D. Arizona.

May 28, 1982.

A. Alan Klatzke, Phoenix, Ariz., for plaintiff.

John R. Mayfield, Asst. U. S. Atty., Phoenix, Ariz., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CRAIG, District Judge.

This is a medical malpractice action instituted against the United States under authority of the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, and 28 U.S.C. § 1346(b). Plaintiff alleges that she was subjected to medical treatment and two operative procedures known as sympathectomies at Wilford Hall Hospital, Lackland Air Force Base, San Antonio, Texas, that did not conform to standard professional medical practices in that they were unnecessary. As a result of the operations, plaintiff alleges that she suffered both temporary and permanent injuries. Defendant has denied that any of its doctors were negligent, has denied that plaintiff's complaint states a claim upon which relief can be granted, and has alleged that the Court lacks subject matter jurisdiction over this action and that the statute of limitations has run.

On January 3, 1978, plaintiff filed a Standard Claim Form 95, Claim for Damage, Injury or Death, with the Claims Office at Williams Air Force Base, Chandler, Arizona. This administrative claim alleged unnecessary surgery on December 29, 1972; unnecessary surgery on April 18, 1973; illegal consent (from person under the influence of narcotics); impotence/sexual dysfunction; bowel obstruction; severe heat

prostration; profuse diaphorisis of the trunk and abdomen; dumping syndrome, and Demerol addiction.

The action was tried before the Court without a jury. The Court after considering all the evidence and the exhibits adduced at trial, together with the applicable law, finds as follows:

## FINDINGS OF FACT

1. Plaintiff is a nurse. She received training at Jesus of St. Jude's University, Oxford, England, earning a degree as a registered nurse in 1961. Subsequent to her graduation, she practiced as a registered nurse in England and Africa. In 1961, during the Berzerta armed conflict, she served as a field nurse in an operating room. After this service, she returned to England as a staff nurse. Plaintiff has also worked as a nurse in Texas and Mississippi. The last place in which she was employed as a nurse was the Nurses' Registry in Phoenix in April, 1976.

2. Plaintiff has a history of reflex sympathetic dystrophy dating from 1954 when she experienced her first episode of cold injury. At that time she suffered frostbite of both feet and her left hand. She also developed severe pain and numbness of both lower extremities. This exposure resulted in chilblains, manifested by erythema and cracking of the skin of her feet. These lesions healed satisfactorily. Plaintiff subsequently suffered bullae of the involved extremities whenever exposed to cold. Plaintiff had another episode of cold injury to these extremities in 1957 or 1959. She was hospitalized, and experienced spontaneous slough of patches of skin of both feet and the left hand. These lesions healed without grafting, but plaintiff continued to have symptoms in both lower extremities and the left upper extremity whenever exposed to cold. She continued to have symptoms of bullae whenever she was exposed to cold.

3. Plaintiff underwent an appendectomy at age 12, and re-exploration for lysis of peritoneal adhesions that same year.

4. Plaintiff's next abdominal surgery was in 1962 when she had a left ovarian cystectomy.

5. In 1963, at Mount Sinai Hospital in New York City, plaintiff underwent a lumbar sympathectomy to relieve pain and hyperhidrosis in her left leg. After this operation, plaintiff experienced no pain in her leg, did not suffer from bowel problems, profuse sweating of her trunk or abdomen, or dumping syndrome, and did not have intestinal obstructions.

6. In October, 1966, plaintiff married her first husband, William Welsh, a captain in the United States Air Force. Plaintiff and her husband were then residing in San Antonio, Texas.

7. In 1966, plaintiff again began experiencing symptoms of reflex sympathetic dystrophy, pain and hyperhidrosis, in her left upper extremity. She was admitted to the Wilford Hall USAF Medical Center at Lackland Air Force Base, San Antonio, Texas. During this hospitalization she underwent several stellate ganglion blocks which resulted in objective and subjective relief of her complaints. However, this relief was only temporary. During the hospitalization she continued to complain of pain and hyperhidrosis in her left arm. She was diagnosed as having reflex sympathetic dystrophy in her left upper extremity, manifested by pain and hyperhidrosis. On October 27, 1966, plaintiff signed the standard Air Force consent form for the performance of a sympathectomy for her left arm. On October 28, 1966, the operation was performed. Excellent results were achieved and relief of her symptoms occurred following this operation. Plaintiff did have residual post-operative neuralgia which resolved itself completely. Plaintiff did not recall experiencing any bowel problems, intestinal obstructions, profuse sweating of her trunk or abdomen, sexual dysfunction, heat prostration, or dumping syndrome after this operation.

8. Prior to plaintiff's November 2, 1966 discharge from this operation, she began experiencing increased symptoms of sympathetic overactivity of the right upper ex-

tremity, chiefly manifested by hyperhidrosis of the right axilla and hand, and pulling sensations in the right upper arm. It was determined that should these symptoms persist plaintiff should be readmitted to the hospital. Probanthine was prescribed for control of the symptoms in her right arm but was relatively ineffective. From November 2, 1966 to November 15, 1966 when she was readmitted to the hospital, plaintiff complained of recurring symptoms and, specifically, that on one occasion, the entire right side of her dress was drenched with sweat and her right hand was dripping wet. This profuse sweating made it impossible for plaintiff to wear street clothes or her nurse's uniforms. Plaintiff also noted accentuation of pain in her right arm.

9. On November 15, 1966, plaintiff signed the standard Air Force consent form for a right dorsal sympathectomy. This operation was performed on November 16, 1966 at the Wilford Hall USAF Medical Center. During this hospitalization, plaintiff was diagnosed as having reflex sympathetic dystrophy in her right upper extremity, manifested by pain and hyperhidrosis. As a result of this operation, excellent relief of her symptoms was achieved. Plaintiff did not recall experiencing any bowel problems, intestinal obstructions, sexual dysfunction, profuse sweating of her trunk or abdomen, heat prostration or dumping syndrome after this operation.

10. On October 10, 1967, plaintiff was voluntarily admitted to the psychiatric service at the Wilford Hall USAF Medical Center. She was evaluated with no finding of any psychosis and was discharged with a referral to a private psychiatrist for further care.

11. On March 12, 1968, plaintiff was again admitted on a voluntary basis to the Wilford Hall USAF Medical Center for psychiatric care. She was again evaluated during this hospitalization and was diagnosed as suffering from manic depressive psychosis, manic phase, acute and chronic, mild. She was discharged on March 18, 1968.

12. On or about July 7, 1969, plaintiff was admitted to the Baylor University Medical Center, Dallas, Texas, where she came under the care of Dr. Morris J. Fogelman, a private physician. The admission notes of July 7 and July 8, 1969 indicate that she had in the past suffered from parasthesia, sweating and bluish discoloration of her hands, arms, feet and lower leg, and pain. She was admitted for reappearance of reflex sympathetic dystrophy in her left arm. Dr. Fogelman explained that the reappearance of the symptoms was due to nerve regeneration. On July 10, 1969, plaintiff underwent a repeat right dorsal sympathectomy. Following this operation, she was relieved of the symptoms in her right arm. Plaintiff did not experience any bowel problems, intestinal obstructions, sexual dysfunction, profuse sweating of her trunk or abdomen, heat prostration or dumping syndrome after this operation.

13. On or about September 2, 1969, plaintiff was readmitted to Baylor University Medical Center for reappearance of her reflex sympathetic dystrophy symptoms in her left arm. She complained of increased sweating and suffered from parasthesia, blueness of digits, and pain in her entire left arm. On September 3, 1969, she underwent a repeat left dorsal sympathectomy for the symptoms she was experiencing in her left upper extremity. She was diagnosed as having sympathetic dystrophy of the left upper extremity. Subsequent to this operation she did not experience any sexual dysfunction, bowel problems, intestinal obstructions, heat prostration, profuse sweating of her trunk or abdomen, or dumping syndrome.

14. Sometime during 1969, plaintiff underwent a tubal ligation involving an abdominal procedure. Subsequent to this operation, she did not experience any sexual dysfunction, bowel problems, intestinal obstructions, heat prostration, profuse sweating of her trunk or abdomen, or dumping syndrome.

15. In February, 1970, plaintiff and her first husband were divorced. In October, 1971, plaintiff married her present husband, Alan Cohen, a captain in the United States Air Force. Plaintiff and her husband resid-

ed at the United States Air Force Base at Mountain Home, Idaho. In the early part of 1972, plaintiff began to develop marked diaphoresis of her left lower extremity which was accompanied by dull aching discomfort and parasthesias. She also complained of recurring pain. Her medical records indicate that in February, March, April, and June these symptoms increased in severity. It was also noted that her symptoms increased with emotional stress. On June 8, 1972, plaintiff was transferred to St. Alphonsus Hospital, Boise, Idaho, for a psychiatric hospitalization. She was evaluated for both her physical and mental problems. She was discharged on or about July 6, 1972 with a diagnosis of depressive reaction and paranoid personality. It was also felt that plaintiff suffered from vasomotor instability. During July, August and September, she continued to have problems with her left leg. Her case was followed by doctors at the Mountain Home Air Force Base Hospital and private physicians and psychiatrists at St. Alphonsus Hospital. On or about October 8, 1972, she was again admitted to St. Alphonsus Hospital for psychiatric treatment and was diagnosed as having a manic depressive psychosis, hypomanic phase of cyclothymic personality disorder. On November 28, 1972, she was seen in the emergency room of the Mountain Home Air Force Base Hospital because of a reappearance of a pulling sensation in her entire left leg. It was noted at this time that she was doing well emotionally and that there was no clear relationship between the pain in her legs and her emotions. From December 5, 1972 to December 19, 1972, plaintiff began experiencing a severe increase in her symptoms of pain and hyperhidrosis. These symptoms were documented on several occasions. During this time she was also being seen by her private psychiatrist who, on one occasion, observed that plaintiff had a cold, sweaty, blue leg. Because of the increase in her symptoms and the psychiatrist's inability to treat her symptoms with psychiatric therapy and medication, arrangements were made to transfer plaintiff to the Wilford Hall USAF Medical Center, Lackland Air Force Base, San Antonio, Texas.

16. From October, 1971 to December 23, 1972, the date plaintiff was transferred to Wilford Hall, she was not exhibiting any symptoms of bowel obstructions, heat prostration, profuse sweating of her trunk or abdomen, or dumping syndrome. Plaintiff was, however, experiencing sexual dysfunction attributed to her emotional upset and depression.

17. Upon plaintiff's admission to Wilford Hall, appropriate physical examinations were performed on her, including a one percent (1%) xylocaine differential diagnostic epidural nerve block. This block was performed prior to plaintiff's December 29, 1972 operation and confirmed the presence of reflex sympathetic dystrophy in the left lower extremity. Plaintiff exhibited symptoms of pain and hyperhidrosis in her left leg prior to the operation, including the presence of slight discoloration. The treating physicians at Wilford Hall were aware of plaintiff's mental problems, including her diagnosis of manic depressive psychosis.

18. On December 28, 1972, plaintiff signed the standard Air Force consent form for the operation for the return of symptoms in her left leg. Plaintiff's consent was informed in that the need for the surgery, the procedures to be used during the surgery, and the risks and anticipated results of the surgery were explained to plaintiff by her treating physicians. Plaintiff was also informed of the possibility that abdominal adhesions could develop because the surgical procedure involved entry into the peritoneal cavity. The procedure performed on December 29, 1972 was a transabdominal thoraco-lumbar sympathectomy to relieve symptoms of causalgia and hyperhidrosis. This operation was a repeat of her 1963 operation and was necessary because either an incomplete sympathectomy had been performed in 1963 or because nerve tissue had subsequently regenerated.

19. Causalgia or causalgic pain is a medical term describing severe, persistent pain which is usually described by the patient as a burning, throbbing, aching, vice-like pain. It is frequently difficult to ob-

tain a classic description from the patient. Causalgic pain is aggravated by both emotional and physical factors. Most frequently causalgia is localized in an extremity, especially the lower limbs. Causalgia is frequently accompanied by vasomotor disturbances, including sweating and coldness of the affected limb. Frequently a psychogenic etiology is suggested, and many patients are considered malingerers or hysterics. No known psychogenic factor is a cause of causalgic type pain. Even though there may be a significant amount of emotional instability, the pain is real. It was well recognized at the time of plaintiff's operations that a lumbar sympathectomy had a great predictable success rate in treating causalgic type pain. There are many initiating causes of causalgic pain, and frostbite, such as that suffered by plaintiff, is considered a primary cause.

20. Hyperhidrosis is a pathologic condition of excessive sweating which is part of a symptom complex which is apparently caused by a poorly understood stimulation of the sympathetic nervous system. It may be an extremely annoying condition, embarrassing socially, and even incapacitating in certain occupations. Under nervous strain it can become so severe that beads of water drip from the fingers. It was well recognized at the time of plaintiff's operations that when all attempts to treat hyperhidrosis medically as well as with psychotherapy have failed that a sympathectomy is indicated. Frostbite injuries are recognized as a cause of this condition.

21. Reflex sympathetic dystrophy is a type of peripheral vascular disease which can be initiated by frostbite or cold injuries. It is a well known phenomenon, characterized by persistent pain and tenderness of the affected limb. It is described as a severe burning or aching which frequently seems out of proportion to the antecedent injury. It is frequently accompanied by hyperhidrosis, vasodilatation, vasoconstriction, parathesia, pallor or cyanosis, and Raynaud's phenomenon. These symptoms are often aggravated by emotional tension and environmental factors. It is well recognized that a sympathectomy is a proper treatment for this dysfunction of the sympathetic nervous system.

22. It is not unusual for symptoms of causalgia, hyperhidrosis and reflex sympathetic dystrophy to appear in a limb that has undergone a sympathectomy. This apparently results from either an incomplete sympathectomy or from regeneration of nerve tissue. Following a sympathectomy in one limb it is also not uncommon for symptoms to reappear in the adjacent limb.

23. Upon awaking after the December 29, 1972 operation, plaintiff felt very ill, weak, was soaking wet, and had a sore or upset stomach. Plaintiff also experienced severe bowel problems. She had never had any trunkal sweating or bowel problems prior to this operation. The bowel pains were acute, and included cramps and burning pain. Plaintiff also experienced vomiting. X-ray tests were performed and there was no evidence of any bowel obstruction. Plaintiff was informed that these difficulties could be related to viral gastroenteritis or a sluggish bowel due to the Demerol she had been receiving.

24. Plaintiff was discharged from Wilford Hall on or about January 11, 1973 and returned to Mountain Home Air Force Base, Boise, Idaho. Upon her return to Mountain Home, her abdominal problems continued. These included constipation, abdominal pain, dull cramping pain, and nausea.

25. On February 14, 1973, plaintiff began to have hyperhidrosis, pain and coldness in her right leg. These symptoms persisted and increased in severity. The symptoms were as severe as those she had in her left leg prior to her December, 1972 surgery. She continued to receive psychiatric and medical treatment. On April 15, 1973, she was again admitted to Wilford Hall Hospital in San Antonio.

26. Upon her admission, tests were performed with respect to the symptoms of causalgia, hyperhidrosis, and reflex sympathetic dystrophy. On April 17, 1973, plaintiff signed the standard Air Force consent form. Plaintiff was informed of the indica-

tions for and the expected results and anticipated difficulty of the surgery, and gave her consent. This operation was a repeat of her 1965 operation and was necessary because either an incomplete sympathectomy had been performed in 1965 or because nerve tissue had subsequently regenerated. The peritoneal cavity was not entered during this operation.

27. After plaintiff's discharge from Wilford Hall on or about April 27, 1973, she returned to Mountain Home Air Force Base in Boise. She continued to experience hyperhidrosis of the trunk and bowel problems, and also began to suffer from heat prostration.

28. In July, 1973, plaintiff became violently ill with cramping abdominal pain, nausea, bowel distention, and severe epigastric pain. She was admitted to the Mountain Home Air Force Base Hospital. Her symptoms increased in severity and included twelve hours of fecal vomiting, vomiting of blood, and acidosic shock. She was immediately transferred to St. Alphonsus Hospital in Boise.

29. Upon her admission to St. Alphonsus Hospital, plaintiff came under the care of a private physician, Dr. Ardean Ediger. On July 25, 1973, Dr. Ediger operated for the purpose of removing partial small bowel obstructions and discovered almost complete obstruction of her small bowel and indications of early gangrene and possible regional enteritis. Numerous adhesions were lysed and the pathology report indicated incomplete infarction of the small bowel.

30. On or about August 18, 1973, plaintiff was again admitted to St. Alphonsus Hospital under the care of Dr. Ediger for symptoms of cramping abdominal pain but not nausea or vomiting.

31. On December 27, 1973, plaintiff was admitted to St. Alphonsus Hospital for treatment of a partial bowel obstruction secondary to intra-abdominal adhesions. During the operation the peritoneal cavity was entered and it was noted that the small bowel was generally covered with numerous adhesions.

32. On February 9, 1974, plaintiff was admitted to St. Alphonsus Hospital under the care of Dr. Ediger for complaints of persistent nausea, vomiting and weight loss following her surgery for intra-abdominal adhesions on December 28, 1973.

33. There are numerous causes for intra-abdominal adhesions.

34. Plaintiff asserts that following the December, 1972 surgery and the April, 1973 surgery, both at Wilford Hall, she suffered sexual dysfunction, dysautonomia of the bowel, neurogenic bowel, neurogenic constipation, feflux esophagitis, duodenogastric reflux, and a denervated pylorus. These disabilities are not related to the two surgical operations referred to.

35. Plaintiff also asserts that since August, 1978, she has undergone numerous operations for intra-abdominal adhesions. These operations are either not related to the two surgical operations referred to or are the result of otherwise justified surgery to which plaintiff gave her informed consent.

## CONCLUSIONS OF LAW

1. Under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., the Court is required to look to state law in determining the liability of the defendant. *Simpson v. United States*, 652 F.2d 831 (9th Cir. 1981).

2. Actions brought under the Federal Tort Claims Act are governed by the law of the place where the act or omission causing the injury occurred. *Mundt v. United States*, 611 F.2d 1257, 1259 (9th Cir. 1980). As the two operations in question occurred in Texas, the substantive law of the State of Texas is controlling.

3. Under Texas law, it is presumed that a physician or surgeon has done his work properly, and a patient can recover only when it can be affirmatively shown that the diagnosis or treatment was not an error in judgment, but a matter of negligence, and that such negligence was a proximate cause of damages claimed by the

patient. *Harle v. Krchnak*, 422 S.W.2d 810, 814 (Tex.Civ.App.1967); *Henderson v. Mason*, 386 S.W.2d 879, 882 (Tex.Civ.App. 1964); *Hersh v. Hendley*, 626 S.W.2d 151, 154 (Tex.App.1981).

4. Under Texas law, when the burden of proof is on the plaintiff to show that his injury was negligently caused by the defendant, the proof must be beyond a showing that the injury possibly arose from the defendant's negligence or lack of skill. *Hart v. VanZandt*, 399 S.W.2d 791, 793 (Tex.1965). It is not enough to show the injury, together with an expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury. The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the finder of fact can do no more than speculate as to which was, in fact, the cause, judgment must be entered for the defendant. *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 785 (1949); *Burchfield v. Gietz*, 516 S.W.2d 229, 233 (Tex.Civ.App.1974).

4. Under Texas law, both negligence and proximate cause must be proven by medical testimony, except in cases where the alleged malpractice and injuries are plainly within the common knowledge of a layman. *Williford v. Banowsky*, 563 S.W.2d 702, 705 (Tex.Civ.App.1978).

6. Under Texas law, an expert cannot establish negligence by testifying as to what he would have done. *Hersh*, supra, at 159.

7. Under Texas law, physicians and surgeons have a duty to disclose to a patient the risks incidental to a medical procedure as would be disclosed by a reasonable physician or surgeon of the same school in the same or a similar community. *Wilson v. Scott*, 412 S.W.2d 299, 302 (Tex.1967); *Sherrill v. McBride*, 603 S.W.2d 365, 366 (Tex.Civ.App.1980).

8. Under Texas law, negligence of a physician or surgeon is never imputed from unsatisfactory results. *Hunter v. Robinson*, 488 S.W.2d 555 (Tex.Civ.App. 1972).

9. The treating physicians at Wilford Hall USAF Medical Center exercised proper medical judgment and conformed with acceptable medical practice in diagnosing the plaintiff's physical and mental condition prior to her December 29, 1972 operation.

10. The December 29, 1972 operation was performed in accordance with acceptable medical practice.

11. The treating physicians at Wilford Hall USAF Medical Center exercised proper medical judgment and conformed with acceptable medical practice in diagnosing the plaintiff's physical and mental condition prior to her April, 1973 operation.

12. The April, 1973 operation was performed in accordance with acceptable medical practice.

13. The physicians at Mountain Home Air Force Base Hospital acted with proper medical judgment and their actions conformed with acceptable medical practice.

14. Plaintiff failed to prove a prima facie case.

15. Plaintiff failed to overcome the presumption that her medical care was proper.

16. Plaintiff failed to show by a preponderance of the evidence that she did not give her informed consent to the December, 1972 and April, 1973 surgeries.

17. Plaintiff failed to prove through medical testimony and by a preponderance of the evidence that the diagnosis and treatment she received at Wilford Hall in December, 1972 and April, 1973 in any way deviated from acceptable medical practice or was unreasonable.

18. Plaintiff failed to prove through medical testimony and by a preponderance of the evidence that the actions of her treating physicians at Wilford Hall in December, 1972 and April, 1973, if negligent, were a proximate cause of her injuries.

19. A statute of limitations defense has been raised by the defendant and considered by the Court. The defense appears to have merit. In July, 1973, plaintiff began experiencing serious bowel problems, including fecal vomiting. In view of plaintiff's training and education as a nurse, these problems were such that she should have known that they could have resulted from adhesions stemming from the December, 1972 and April, 1973 surgeries. Her failure to determine the facts giving rise to her injuries and then file her administrative claim suggests that the statute of limitations defense is meritorious. In light of the fact, however, that the Court has disposed of this case on its merits, no ruling will be made on this issue.

20. In the event any of the foregoing findings of fact should be more properly considered conclusions of law, they should be so considered. In the event any of the foregoing conclusions of law should be more properly considered findings of fact, they should be so considered.

IT IS SO ORDERED.

### JUDGMENT

Pursuant to Rule 54, Federal Rules of Civil Procedure, and the Findings of Fact and Conclusions of Law filed simultaneously herewith, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiff take nothing by her complaint and that defendant shall have and recover its costs as may be provided by law.

IT IS SO ORDERED.